## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMUNITY BANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 19-512 |
| vs. | ) | Judge Nora Barry Fischer |
| | ) | |
| | ) | |
| FIDELITY NATIONAL TITLE INSURANCE | ) | |
| COMPANY, | | |
| | | |
| Defendant. | | |

## MEMORANDUM OPINION

### I. INTRODUCTION

In this breach of contract case, Plaintiff, Community Bank, seeks a declaratory judgment and monetary damages from Defendant, Fidelity National Title Insurance Company, under an insurance policy. Community Bank claims that the policy's provisions covering unmarketability of title and right of access were invoked when a contemplated subdivision plan never came to fruition, thereby causing the property to lose value. For its part, Fidelity claims that the policy's provisions do not cover Community Bank's losses. Presently before the Court are Fidelity's Motion for Summary Judgment (Docket No. 37), Community Bank's Response in Opposition (Docket No. 42), and Fidelity's Reply (Docket No. 43). After careful consideration of the parties' positions and for the following reasons, Fidelity's Motion [37] is granted.

### II. FACTUAL BACKGROUND[1]

---

[1] The factual background derives from the undisputed evidence of record, and any disputed evidence is viewed in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor.").

## A. Relevant Facts

This case originates from an October 23, 2007 purchase of a roughly 29.6-acre parcel of vacant land located on Gillcrest Drive, Jefferson Hills Borough, Allegheny County, Pennsylvania 15025. (Docket No. 37 ¶ 1; Docket No. 40 ¶ 1). Blackwood Pointe Associates, LLC, purchased that property from RCH Jefferson, L.P., for $2.2 million intending to develop and subdivide the land in accordance with an approved, unrecorded subdivision plan – Blackwood Acres Plan No. 1. (*Id.* at ¶¶ 1-3). To make the purchase, Blackwood (hereinafter referred to as the "Borrower") borrowed $2.1 million via a loan from Community Bank. (*Id.*). Immediately after the purchase, the Borrower recorded its deed, while Community Bank recorded a mortgage on the property and secured a $2.1 million title insurance policy with Fidelity National Title Insurance Company. (*Id.* at ¶¶ 3-5).

As contemplated at the time of the purchase, the parcel was intended to be part of Blackwood Acres Plan No. 1, a proposed subdivision plan by which the property would be "subdivided and developed into a multi-unit housing development containing a total of 110 units (comprised of four single-family units and 106 townhouse units)." (Docket No. 37 ¶¶ 10-11; Docket No. 40 ¶¶ 10-11). Reflecting the anticipated plan, the deed, the mortgage, and the insurance policy[2] identified the legal description of the property as:

> Lot or piece of ground situate[d] in the Borough of Jefferson Hills, formerly Borough of Jefferson, County of Allegheny and Commonwealth of Pennsylvania, identified as the "Subdivided Area" in the Blackwood Acres Plan No. 1 . . .[3]

---

[2] The insurance policy also more generally referred to the property as "29.6273 acres [in] Jefferson Hills Borough, Allegheny County, Pennsylvania," as well as "Lot & Block No. 769-C-100." (Docket No. 1-4 at 3).

[3] While the deed and insurance policy use identical language when describing the property, the mortgage uses slightly different terminology by referring to the property as "Parcel C in the Blackwood Acres Plan No. 1" rather than the "Subdivided Area." *See* (Docket No. 1-3 at 12).

(*Id.* at ¶¶ 2, 7; *see also* Docket No. 1-2 at 3; Docket No. 1-3 at 12; Docket No. 1-4 at 7). Because Blackwood Acres Plan No. 1 was not yet recorded at the time of the sale, the legal description of the property also contained blanks to be filled in with the recording date and the plan book volume and page number for the plan. (*See generally id.*). But, despite the parties' intentions, the development plan never materialized.

The Blackwood Acres Plan No. 1 was originally approved by the Borough of Jefferson Hills through a resolution in September 2006. (Docket No. 37 ¶¶ 12-16; Docket No. 40 ¶¶ 12-16). The plan was subject to numerous conditions that the Borrower had to satisfy within 90 days, including posting a security deposit with the Borough and securing an agreement with a developer. (*Id.*). Those conditions were not satisfied within the original 90-day period, and the plan was reapproved in May 2007, subject to the same conditions and 90-day timeframe. (*Id.* at ¶¶ 17-19). Just prior to the sale in October 2007, the Borough sent the Borrower a letter stating that "[a]s of the date of this letter, the conditions of approval have not been met and the approval of May 14th has expired" and readvised that "Borough officials cannot sign the mylars for this plan." (*Id.* at ¶ 20).

James McCune, Community Bank's counsel and serving as both the title agent and closing agent for the loan, was aware that the Borough's conditions remained unsatisfied prior to the closing. (*Id.* at ¶¶ 24, 27, 41-42 109). Additionally, Mr. McCune was aware that the plan was unrecorded because, when the Borrower applied for the loan from Community Bank to purchase the property, it attached a copy of the unsigned, unrecorded Blackwood Acres Plan No. 1 to the loan application. (*Id.* at ¶¶ 31-35). Nonetheless, Mr. McCune prepared the title commitment for

---

Notwithstanding this minor difference, it is undisputed that all three documents describe the property as being part of the Blackwood Acres Plan No. 1.

Community Bank, recorded the deed and mortgage, and issued the policy after overseeing the closing in October 2007. (*Id.* at ¶¶ 26-27, 31-35, 60). Community Bank's representatives, including Mr. McCune, approved the transaction notwithstanding the unsatisfied conditions and unrecorded plan while acknowledging that there was "a risk that it could not be developed or was not going to be developed," that the Borough "wouldn't release the subdivision plan or allow it to be recorded," and that the Borough was "not going to let [the unsatisfied conditions of the plan] go indefinitely." (*Id.*).

Well after the second 90-day period was up, in December 2007, the Borough granted another approval of the Blackwood Acres Plan No. 1, this time for a 180-day period that extended into June 2008. (*Id.* at ¶ 66). That approval was subject to the same conditions as the prior two. (*Id.* at ¶ 67). By March 2008, the Borrower had satisfied none of the Borough's conditions, as it had neither paid the Borough a security deposit nor executed an agreement with its chosen developer, and the Borrower advised Community Bank that the conditions were unlikely to ever be met. (*Id.* at ¶¶ 50, 69-70, 73). Moreover, no payments had been made to Community Bank under the loan agreement, so Community Bank decided to foreclose on the mortgage. (*Id.* at ¶¶ 71, 76).

While the foreclosure action was pending, Community Bank proceeded in two ways. First, it had the Borrower assent to the conditions of the Blackwood Acres Plan No. 1 on its behalf in order to receive another 180-day extension from the Borough to run through December 2008. (*Id.* at ¶¶ 78-79). Second, Community Bank had the property appraised, with the hypothetical subdivision plan included, for $1.7 million. (*Id.* at ¶¶ 72-75, 100). Despite the 180-day extension, the Borough's conditions were not satisfied. (*Id.* at ¶ 80). And, in December 2008, when Community Bank requested yet another extension, Borough Council rejected the request given frustration about the number of times the approval had been extended. (*Id.* at ¶¶ 82-83). As a result,

Blackwood Acres Plan No. 1 was never recorded, and the development plan was abandoned. (*Id.* at ¶ 87).

In February 2009, Community Bank obtained a default judgment in its foreclosure action and a Sherriff's deed to the property in October 2009 following sale. (*Id.* at ¶¶ 76, 88). Community Bank had the property reappraised, this time without the benefit of the hypothetical subdivision plan, for $400,000. (*Id.* at ¶¶ 99-100). In addition to the property and in an attempt to recoup some of its losses, Community Bank recovered a $200,000 deposit from the Borrower's developer and attempted to sue the Borrower's personal guarantor, but he did not have any assets to levy. (*Id.* at ¶¶ 89-91). After attempting to sell the parcel as a whole, in February 2015, Community Bank proposed a new subdivision plan, titled the Community Bank – JHB Plan No. 1. (*Id.* at ¶¶ 92-97). On August 8, 2016, the Borough approved Community Bank's plan, and it was recorded on August 19, 2016. (*Id.*). Ultimately on April 11, 2019, with the new subdivision plan in place, Community Bank agreed to sell the property to another developer for $300,000. (*Id.* at ¶ 101; *see also* Docket No. 37-8 at 8).

On October 12, 2016, Community Bank submitted a claim to Fidelity under its policy, "seeking reimbursement for [alleged] actual monetary damages sustained or incurred by reason of the unmarketability and inaccessibility of the Property from and after recordation of the Sherriff's Deed in October 2009 until approval and recordation of the Community Bank Plan in August 2016, as well as the [alleged] diminution in value of the Property due to such defects." (*Id.* at ¶ 102). Fidelity denied the claim on August 2, 2017. (*Id.* at ¶ 107). In its denial, Fidelity opined that the unfulfilled subdivision plan neither rendered the property inaccessible nor its title unmarketable, and even if it did, Community Bank "failed to provide timely notice of the claimed defects pursuant to the Notice provisions in the Policy" and "[f]urther, because [Fidelity] did not approve payment

of the expenses incurred by [Community Bank] in addressing the claimed title defects in advance, nor did it approve [Community Bank's] voluntary resolution of the claim, [Community Bank] is not entitled to any loss or other payment under the Policy." (Docket No. 37-4 at 18). Further, Fidelity explained that the policy did not cover diminution of value. (*Id.* at 19-20).

### B.  Review of Pertinent Policy Provisions

The insurance policy between Community Bank and Fidelity listed eight covered risks:

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, FIDELITY NATIONAL TITLE INSURANCE COMPANY, a California corporation, herein called the Company, Insures, as of Date of Policy shown in Schedule A, against loss[4] or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the Insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than stated herein;
2. Any defect in or lien or encumbrance on the title;
3. Unmarketability of the title;
4. Lack of a right of access to and from the land;
5. The invalidity of enforceability of the lien of the Insured mortgage upon the title;
6. The priority of any lien or encumbrance over the lien of the Insured mortgage;
7. Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material, arising from . . . ;
8. The invalidity of unenforceability of any assignment of the Insured mortgage . . . .

(Docket No. 1-4 at 2). Beyond the coverage section, the policy included Schedule A (a Declarations page bearing the policy number, date, amount of coverage, name of insured, and

---

[4] The policy does not define what constitutes "loss." Hence, the Court looks to the plain meaning to define the term. *See Erie Ins. Grp. v. Shue*, 741 A.2d 803, 807 n.3 (Pa. Super. Ct. 1999) ("An axiom of contract law requires that words be given their plain meaning and insurance policies, comprising a subset of contract law, are to be construed according to the ordinary meaning of their words not otherwise defined."). Black's Law defines loss, within the insurance context, as "[t]he amount of financial detriment caused by . . . an insured property's damage, for which the insurer becomes liable." *See* Bryan A. Garner, Black's Law Dictionary (11th ed. 2019); *see also Bishops, Inc. v. Penn Nat'l Ins.*, 984 A.2d 982, 996 n.8 (Pa. Super. Ct. 2009) (applying the same definition where the term "loss" was not defined by the policy).

insured land), Schedule B (enumerating 28 exceptions from coverage), and Schedule C (a detailed

property description). (*See id.* at 3-8). Under Schedule B's numerous exceptions from coverage,

the policy stated that "Th[e] policy does not Insure against loss or damage (and [Fidelity] will not

pay costs, attorneys' fees or expenses) which arise by reason of . . . [s]ubject to all matters as set

forth in the Blackwood Acres Plan No. 1 as recorded in the Recorder's Office of Allegheny

County, Pennsylvania In Plan Book Volume , page_." (*Id.* at 4 ¶ 11).

Finally, the policy included a number of exclusions, conditions, and stipulations. (*Id.* at

12). Within the conditions there was a "definition of terms" section, which defined

"unmarketability of the title" as "an alleged or apparent matter affecting the title to the land, not

excluded or excepted from coverage, which would entitle a purchaser of the estate or interest

described in Schedule A or the insured mortgage to be released from the obligation to purchase by

virtue of a contractual condition requiring the delivery of marketable title." (*Id.* at 12 ¶ 1(g)).

Additionally, one of the explicit conditions enumerated in the policy was a notice provision by

which "[t]he Insured shall notify [Fidelity] promptly in writing . . . if the title to the estate . . . is

rejected as unmarketable[;] If prompt notice shall not be given to [Fidelity], then as to the insured

all liability of [Fidelity] shall terminate[.]" (*Id.* at 12 ¶ 3). The conditions and stipulations further

elaborated on the notice provision:

> If the proposed Insured has or acquires actual knowledge of any defect, lien,
> encumbrance, adverse claim or other matter affecting the estate or interest or
> mortgage thereon covered by this Commitment other than those shown in Schedule
> B hereof, and shall fail to disclose such knowledge to the Company in writing, the
> Company shall be relieved from liability for any loss or damage resulting from any
> act of reliance hereon to the extent the Company is prejudiced by failure to so
> disclose such knowledge.

(*Id.* at 21 ¶ 2). Once the insured submits a claim, the policy provides that it "is a contract of

indemnity against actual monetary loss or damages sustained or incurred by the insured claimant

who has suffered loss or damage by reason of matters insured against by this policy." (*Id.* at 13, ¶ 7).

### III. PROCEDURAL HISTORY

Following Fidelity's denial of coverage, Community Bank filed a two-count complaint in this Court on May 3, 2019. (Docket No. 1). In Count 1, Community Bank seeks a declaration "that it is entitled to coverage under the Policy and that it is entitled to reimbursement for actual monetary damages sustained or incurred by reason of the unmarketability and inaccessibility of the Property . . . as well as the diminution in vale [sic] of the Property due to such defects." (*Id.* at ¶ 37). In Count 2, Community Bank claims breach of contract, alleging that it is entitled to monetary damages under the policy's unmarketability-of-title and right-of-access provisions due to the property's value being diminished.[5] (*Id.* at ¶¶ 39-44). Fidelity answered the complaint on July 3, 2019. (Docket No. 12). Following fact discovery, on February 15, 2021, Fidelity moved for summary judgment and filed a brief in support. (Docket No. 37). Fidelity also filed its statement of undisputed material facts. (*Id.*). On March 31, 2021, Community Bank countered by filing a brief in opposition, its own set of material facts, and an appendix of exhibits in support. (Docket Nos. 40-42). Two weeks later, on April 14, 2021, Fidelity filed a reply brief, which included a reply to Community Bank's counterstatement of material facts. (Docket No. 43). Community Bank did not file any further response. As such, the Court considers Fidelity's motion fully briefed and ripe for disposition.

---

[5] Given that the amount of monetary damages sought, i.e. alleged diminution of the property from $1.7 million in an April 2008 appraisal to $400,000 in a September 2009 appraisal, exceeds the jurisdictional amount of $75,000, and that Community Bank is a Pennsylvania corporation with a principal place of business in Pennsylvania and Fidelity is a Florida corporation with a principal place of business in Florida, this Court has jurisdiction over the controversy under 28 U.S.C. § 1332(a)(1). (*See* Docket No. 1 ¶¶ 1-3, 29-30, 37, 42; *see also* Docket No. 37 at ¶¶ 99-100; Docket No. 40 at ¶¶ 99-100).

## IV. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also GEICO Cas. Co. v. Alicea*, 416 F. Supp. 3d 425, 429 (W.D. Pa. 2019) (Bloch, J.). A party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015). If the movant makes that requisite showing, then Fed. R. Civ. P. 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001) (quoting *Celotex*, 477 U.S. at 322).

On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 172 (3d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* (quoting *Anderson*, 477 U.S. at 247-48) (emphasis in original)). To that end, a genuine dispute of material fact is one that could affect the outcome of the litigation. *See Morton v. Gardner*, 488 F. Supp. 3d 200, 204 (W.D. Pa. 2020) (citing *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015));

*see also Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[;] [f]actual disputes that are irrelevant or unnecessary will not be counted."). And once the moving party satisfies its burden, the non-moving party must present sufficient evidence of facts that, when viewed in the light most favorable to it, demonstrate a genuine issue, in rebuttal. *Santini*, 795 F.3d at 416 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In this regard, the non-movant must come forward with more than "some metaphysical doubt as to the material facts." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 218 (3d Cir. 2015); *see also Matsushita*, 475 U.S. at 586-87. The non-movant "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 51 (3d Cir. 2007) (quoting *Matsushita*, 475 U.S. at 587) (emphasis in original)).

In order to determine whether a genuine issue of material fact exists, the Court's analysis begins by review of the parties' filings to determine the realm of potentially disputed facts. As such, all summary judgment filings must comply with Fed. R. Civ. P. 56, as well as this Court's companion Local Rule 56, both of which "allow facts to be deemed admitted where they are not properly opposed." *See Kelly v. DeJoy*, 2021 WL 914207, at *4 (W.D. Pa. Mar. 10, 2021) (Hardy, J.) (citing Fed. R. Civ. P. 56(e) ("If a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."); LCvR 56(E) ("Alleged material facts set forth in the moving party's Concise Statement of Material Facts...which are claimed to be undisputed, will for the purposes of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.")); *Jankowski v. Demand*, 2008

WL 1901347, at *1 (W.D. Pa. Apr. 25, 2008) (deeming defendants' facts to be admitted because the plaintiff had failed to adhere to Local Rule 56 and respond to the defendants' statement of material facts). Thus, the parties' adherence to these rules is critical for determining whether summary judgment is appropriate because "[t]hese rules 'do not exist only as mere formalities; they serve an important purpose for the Court.'" *See Kelly*, 2021 WL 914207, at *4 (quoting *Cuppett v. Rite Aid of Pennsylvania, Inc.*, 2019 WL 5310578, at *1, n.1 (W.D. Pa. Oct. 21, 2019) (Gibson, J.)).

With the realm of disputed facts defined, when determining whether summary judgment is appropriate in an insurance coverage dispute, the Court must "look first to the terms of the policy which are a manifestation of the 'intent of the parties.'" *See Hanover Ins. Co. v. Urban Outfitters, Inc.*, 806 F.3d 761, 765 (3d Cir. 2015) (citations omitted). Then, the Court is to "compare the terms of the policy to the allegations in the underlying claim" or claims. *See id.* In that regard, "the insured bears the initial burden of showing that the harm described in the plaintiff's complaint potentially falls within the scope of the policy." *Devcon Int'l Corp. v. Reliance Ins. Co.*, 609 F.3d 214, 218 (3d Cir. 2010) (citing *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 110 (3d Cir. 2009)). If the insured bears that burden, "[t]he burden then shifts to the insurer to demonstrate that an exclusion places the particular harm outside of the policy's reach." *Id.* Exclusions from coverage are strictly construed against the drafter of the policy, i.e. the insurer. *See id.* However, if the insured cannot establish that its loss falls within the terms of the policy, or if the insurer demonstrates that an exclusion applies, then summary judgment is appropriate. *See generally id.*

Having considered the parties' arguments in light of the relevant standards, the Court finds that there is no genuine dispute as to any material fact. Interpreting the policy under Pennsylvania

law[6] and for the foregoing reasons, Community Bank is not entitled to coverage under the policy, and Fidelity is entitled to judgment as a matter of law.

## V. DISCUSSION

In reviewing Community Bank's claims that it is entitled to coverage under the insurance policy, and, in turn, damages for Fidelity's denial of coverage, the Court begins by summarizing the parties' arguments. Then, applying the plain language of the policy, the Court analyzes those arguments to determine whether the losses are covered. For the following reasons, the Court concludes that Community Bank's losses were not covered under the policy, and thus, Fidelity did not breach the policy by denying its claim.

### A. Overview of Arguments

Community Bank's arguments for policy coverage stem entirely from the failed Blackwood Acres Plan No. 1. First, Community Bank attempts to invoke both the unmarketability and right-of-access policy provisions by claiming that the property lacked a legal right of access.[7]

---

[6] Under the doctrine set forth in *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), "federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996); *see also Schmigel v. Uchal*, 800 F.3d 113, 119 (3d Cir. 2015). The insurance policy contains a choice of law provision for arbitration only, (*see* Docket No. 1-4 at 14), however, given the situs of the insured property and Community Bank being located in Pennsylvania, the contract being made in Pennsylvania (*see* Docket No. 1-4 at 2), and the parties' agreement that Pennsylvania law controls, the Court will apply Pennsylvania law. (*See* Docket No. 37 at 7 n.2; Docket No. 42 at 1 n.1); *see also Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 162 (3d Cir. 2011) ("Under Pennsylvania law, an insurance contract is governed by the law of the state in which the contract was made.") (citing *Crawford v. Manhattan Life Ins. Co.*, 221 A.2d 877 (Pa. Super. Ct. 1966)); *3039 B Street Assocs., Inc. v. Lexington Ins. Co.*, 740 F. Supp. 2d 671, 675-76 & n.7 (E.D. Pa. 2010) (applying Pennsylvania law to an insurance policy that "did not contain a conflict of laws provision," but the "situs of the insureds and property" was located in Pennsylvania).

[7] Most Courts that have addressed the narrow issue of whether a lack of a right of access also renders title unmarketable have found that "[l]ack of legal access makes title unmarketable." *See*

Specifically, Community Bank asserts that the property was "inaccessible" because the unrealized subdivision plan meant that "the Property remained a part of a single parcel identified as Tax Parcel Block and Lot No. 769-C-100, which lot included acreage owned by third parties . . . render[ing] [it] inaccessible and unmarketable[.]" (Docket No. 1 at ¶¶ 22-23).

Second, Community Bank again attempts to invoke the unmarketability provision alleging that its title was unmarketable due to the unfulfilled Blackwood Acres Plan No. 1. Community Bank advances that argument because of the subdivision plan's reference in the policy, and its "reasonable expectation was that the Policy insured the Property, and thus Community Bank's interest therein, would have the benefit of Blackwood Acres Plan No. 1." (Docket No. 42 at 8). Stemming from that position, Community Bank asserts that "the Property was rendered unmarketable, as defined in the Policy, because the Property was not subdivided in accordance with Blackwood Acres Plan No. 1," which, in turn, caused the property to lose value. (*Id.* at 11). Accordingly, Community Bank seeks to recover that diminution of property value, i.e. the alleged lost value measured by two appraisals: one in April 2008 for $1.7 million, which included the hypothetical subdivision, and one in September 2009 for $400,000, which appraised the property as vacant, undeveloped land. (Docket No. 1 at ¶¶ 29-30, 37, 42; *see also* Docket No. 37 at ¶¶ 99-100; Docket No. 40 at ¶¶ 99-100).

For its part, Fidelity asserts that Community Bank is not entitled to coverage under the policy because the property never lacked a right of access; Community Bank's title was never

---

Joyce Palomar, 1 Title Ins. Law § 5.7 (2020 ed.) (August 2020 update), at n.71 (collecting cases). However, there are a minority of Courts that have found the opposite. *See generally id.* at n.72; *see also Fidelity Nat'l Title Ins. Co. v. Woody Creek Ventures, LLC*, 830 F.3d 1209, 1210 (10th Cir. 2016) (holding that under Colorado law "the lack of permanent access doesn't render [the owner's] title unmarketable). As discussed *infra*, given that the property was not inaccessible, and that Pennsylvania Courts have not yet opined on this issue, the Court finds it to be a distinction without a difference in this case.

affected; and the policy does not cover diminution of value.[8] (Docket No. 37). Beginning with the

right-of-access, Fidelity has submitted an expert report from J. Bushnell Nielsen,[9] who opined,

after reviewing all of the pertinent documents, that "the Property had a right of access on the Policy

date, and that the access coverage of the Policy was not invoked" because "the Property directly

abutted more than one road." (*See* Docket No. 37-4 at 29, 32, 53). Further, Fidelity maintains that

---

[8] Fidelity also asserts that Community Bank's claims are barred by the statute of limitations. (Docket No. 37 at 20-22). Pennsylvania has a four-year statute of limitations for breach of contract actions. *See Hahnemann Univ. Hosp. v. All Shore, Inc.*, 514 F.3d 300, 306 (3d Cir. 2008); *see also* 42 Pa. Cons. Stat. Ann. § 5525(a)(8). That four-year time period begins to run "from the time the cause of action accrued," which "occurs as soon as the right to institute and maintain a suit arises." *See* 42 Pa. Cons. Stat. Ann. § 5502(a); *see also Erie Ins. Exch. v. Bristol*, 174 A.3d 578, 585 (Pa. 2017). The parties debate the accrual date, with Fidelity asserting that Community Bank's claims accrued, at the latest, in 2009 when it allegedly received bad title under the Sheriff's deed and Community Bank responding that its claims did not accrue until Fidelity denied its claim under the policy in August 2017. (*See* Docket No. 37 at 21-22 (citing *U.S. Bank Nat'l Ass'n v. First Am. Title Ins. Co.*, 944 F.Supp.2d 386 (E.D. Pa. 2013), *aff'd* 570 F. App'x 209 (3d Cir. 2014) (holding that the SOL began to run when Plaintiff suffered a "legal loss," i.e. its "interest in the property [was] affected"); *see also* Docket No. at 12-15 (citing *Erie Insurance Exchange v. Bristol*, 174 A.3d 578 (Pa. 2017) (holding, pursuant to an under insured motorist policy, "the proper circumstance to start the running of the limitation period is an alleged breach of the insurance contract, which will be occasioned in this context by a *denial of a claim* or the refusal to arbitrate." (emphasis added)). However, given the Court's interpretation of the policy finding that no coverage exists, the Court need not address this defense further. Similarly, the Court need not address Fidelity's additional defense of its denial of coverage on the bases of Community Bank's failure to provide timely notice under the policy's notice provision and Community Bank's voluntary assumption of its loss under the policy's limitation-of-liability provision. *See infra* at 16-17; (*see also* Docket No. 12 at 9, ¶¶ 61-64; Docket No. 37 at 17-18).

[9] Mr. Nielsen has "39 years of work experience in and related to the land title insurance industry," including "as a title searcher and examiner, title insurance claim administrator, claim department supervisor and a lawyer in private practice with extensive experience in the review of title insurance commitments and policies." (Docket No. 37-4 at 24, 54). Since 2000, he has served as a shareholder at Reinhart Boerner Van Deuren, s.c. (*Id.* at 56). Additionally since 1996,, he has authored a treatise, the *Title and Escrow Claims Guide*, "which distills the customs and practices employed by title insurers in the handling of title insurance claims" and "is regularly used by title insurance claim administrators, regulators, underwriting counsel and coverage counsel in private practice." (*See id.* at 24 (citing J. Bushnell Nielsen, *Title and Escrow Claims Guide*, American Land Title Association (2020 ed.)). Given his extensive experience, Mr. Nielsen has testified as an expert in 19 trials across 13 States and has provided reports and been deposed in numerous other cases. (*See id.* at 73-83).

the title was never unmarketable because Community Bank "has presented no evidence of a matter *affecting title* to the Property . . . which would justify a purchaser of the insured interest to be released from the obligation to purchase." (Docket No. 37 at 17). And finally, the resulting loss of value to the property following the unfulfilled subdivision was not covered by the policy, which was known and indeed acknowledged by Mr. McCune, Community Bank's representative. (*See id.*)

### B. Policy Coverage

As noted above, Community Bank seeks a declaration that "it is entitled to coverage under the Policy." (Docket No. 1). It then claims that Fidelity breached the insurance policy when it failed to pay its claim for coverage seeking monetary damages resulting from "unmarketability and inaccessibility of the Property . . . as well as diminution" of the property's value. (*Id.*). However, if there is no coverage under the policy for the claims at hand, then there can be no breach of contract. *See Capital Flip, LLC v. Am. Modern Select Ins. Co.*, 416 F. Supp. 3d 435, 437 (W.D. Pa. 2019) (Stickman, J.) (granting motion to dismiss where, pursuant to plain terms of insurance contract, "there was no coverage upon which to premise a claim for breach of contract"). Against this backdrop, the Court now addresses the policy terms given the declaratory relief being sought.

As the insured, it is Community Bank's burden to show that its claims are covered under the policy. *See Devcon.*, 609 F.3d at 218 (citation omitted). When reviewing the policy to determine whether a particular loss is covered, the Court is "guided by the polestar principle that insurance policies are contracts between an insurer and a policyholder." *See Kurach v. Truck Ins. Exch.*, 235 A.3d 1106, 1116 (Pa. 2020). "Thus, [the Court] appl[ies] traditional principles of contract interpretation in ascertaining the meaning of the terms used therein." *See id.* In that regard,

"[i]f policy terms are clear and unambiguous, then [the Court] will give those terms their plain and ordinary meaning, unless they violate a clearly established public policy." *See id.* However, if a provision of the policy is ambiguous, meaning "subject to more than one reasonable interpretation when applied to a particular set of facts," then "the policy provision is to be construed in favor of the policyholder and against the insurer, as the insurer drafted the policy and selected the language which was used therein." *See id*; *see also Devcon*, 609 F.3d at 218 (citations omitted).

Here, the policy between the parties specifically lists "[u]nmarketability of the title" and "[l]ack of a right of access to and from the land" as covered losses. (Docket No. 1-4 at 2). The policy defines "unmarketability of title" as "an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A or the insured mortgage to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title," which is consistent with Pennsylvania law.[10] (*See id.* at 12 ¶ 1(g)). The policy does not define "right of access," but in Pennsylvania, legal right of access is defined as "the right of reasonable ingress and egress" to and from one's property. *See Dep't of Transp. v. Richards*, 556 A.2d 510, 513 n.7 (Pa. Commw. Ct. 1989) (citing *Breinig v. Allegheny Cnty.*, 2 A.2d 842, 847 (Pa. 1938)). "Such right of access does not entitle the abutting owner to access to all points" of the property. *See Wolf v. Dep't of Highways*, 220 A.2d 868, 871 (Pa. 1966). In other words, "[w]hile standard . . . title insurance policies insure a legal 'right of access,' it is important to understand they do not insure any particular physical route." *See* Joyce Palomar, 1 Title Ins. Law § 5.8 (2020 ed.) (August 2020 update).

---

[10] "Under Pennsylvania law, title is unmarketable if it would expose 'the party holding it to litigation.'" *Scott v. Turner*, 345 F. App'x 761, 763 (3d Cir. 2009) (citing *Swayne v. Lyon*, 67 Pa. 463 (Pa. 1871)).

Given the Court's interpretation of the asserted policy terms, Community Bank's claims, which are all premised upon the unrealized Blackwood Acres Plan No. 1, fail as a matter of law. The Court initially notes, however, that even if its claims were covered under the policy, Community Bank did not comply with the policy terms as far as notifying Fidelity in writing of the apparent defects as soon as they were known. (*See* Docket No. 1-4 at 12). Mr. McCune, an agent of Community Bank and, for limited purposes, Fidelity as well as the author of the title commitment, knew that the subdivision plan was unrecorded and that the Borough's conditions were not met as the borrower had not yet made the security payment.[11] (*See* Docket No. 37 at ¶¶ 41-47; Docket No. 40 at ¶¶ 41-47); *see also* Docket No. 37-6 at 20-21). Mr. McCune also testified in his deposition that his understanding was that, pursuant to exception 11, "the commitment was taking exception to anything appearing in Blackwood Acres Plan No. 1." (*See id.* at ¶¶ 28-30; *see also* Docket No. 37-6 at 22). To that end, Mr. McCune's knowledge is imputed to the insured, Community Bank, as he became aware of Blackwood Acres Plan No. 1's deficiencies within the scope of his authority. *See Stingray Pressure Pumping, LLC v. EQT Prod. Co.*, 2019 WL 1880034, at *4 (W.D. Pa. Apr. 26, 2019)* ("Under Pennsylvania law, knowledge of an agent, acting with the scope of his authority, real or apparent, may be imputed to the principal, and thus, knowledge of the agent is knowledge of the principal.") (alteration, citation, and internal quotation marks omitted)). As such, Community Bank was aware that the Blackwood Acres Plan No. 1 was unrecorded, and that the Borough's conditions were unsatisfied, prior to the closing in October

---

[11] In its counterstatement of material facts, Community Bank failed to properly rebut certain facts claimed by Fidelity, and further, entirely failed to rebut Community Bank's counterstatement of material facts. Thus, because Community Bank failed to properly comply with Fed. R. Civ. P. 56(e) and Local Rule 56(e), as directed by the Court's orders, those unrebutted facts will be deemed admitted. (*See* Docket No. 18 ("Any motion for summary judgment and opposition thereto shall conform to the requirements of Local Rule 56."); Docket No. 36 ("Motions for summary judgment shall comply with Local Rule 56."); *see also Kelly*, 2021 WL 914207, at *4.

2007 and that knowledge was amplified when its December 2008 extension request was denied by the Borough. (*See* Docket No. 37 at ¶¶ 31-35; Docket No. 40 at ¶¶ 31-35).[12] Therefore, Community Bank's losses were not unforeseen at the time the policy was executed. *See Tower Ins. Co. v. Dockside Assocs. Pier 30 LP*, 834 F. Supp. 2d 257, 265 (E.D. Pa. 2011) ("The 'known loss' doctrine precludes one from insuring against a loss that has already occurred or is ongoing[, and] [b]ecause insurance is intended to protect insureds from unknown risks, an insurance policy does [not] afford protection to an insured who was or should have been aware of the existence of a covered condition when entering into an insurance contract.") (internal citations omitted)); *see also Rohm & Haas Co. v. Cont'l Cas. Co.*, 781 A.2d 1172, 1177 (Pa. 2001) (adopting the "standard for the known loss defense" in Pennsylvania as "whether the evidence shows that the insured was charged with knowledge which reasonably shows that it was, or should [have been], aware of a likely exposure to losses which would reach the level of coverage") (alteration in original)); *Millers Cap. Ins. Co. v. Gambone Bros. Dev. Co., Inc.*, 941 A.2d 706, 708 (Pa. Super. Ct. 2007) (noting that the insured "purchased extensive insurance coverage" in order "[t]o cover the unforeseen risks and hazards inherent in" its insured interest). Moreover, Community Bank cannot now rely on its "reasonable expectation" under the policy when the policy's plain language does not insure the subdivision plan.[13]

---

[12] Community Bank arguably may have failed to disclose to Fidelity in writing as the notice provision, *supra* at 7, mandates under the policy. Yet, the Court is mindful that Mr. McCune wore more than one hat during the pertinent negotiations and transaction.

[13] Community Bank waited until 2016 to submit its claim to Fidelity, claiming in part that its "reasonable expectation was that the Policy insured that the Property, and thus Community Bank's interest therein, would have the benefit of Blackwood Acres Plan No. 1." (Docket No. 42 at 8). As stated *infra*, Community Bank is a sophisticated entity. *See Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 904 n.8 (3d Cir. 1997) ("A 'sophisticated' insured is typically characterized as a large commercial enterprise that has substantial economic strength, desirability as a customer, and an understanding of insurance matters, or readily available assistance in understanding and procuring

To that end, Fidelity and Community Bank, two sophisticated parties negotiating at arm's length, could have included the failure of the speculative subdivision plan or a correlated diminution of value within the policy's covered risks. *See EQT Prod. Co. v. Terra Servs. LLC*, 2018 WL 658871, at *11 (W.D. Pa. Feb. 1, 2018) ("Pennsylvania courts generally enforce the unambiguous terms of agreements between sophisticated parties that are freely negotiated at arm's length in order to allow the parties to such agreements the benefits of their bargains.") (citing *McMullen v. Kutz*, 985 A.2d 769, 778 (Pa. 2009) ("[F]reely negotiated agreements entered into at arm's length are generally enforced according to their terms to allow parties the benefit of their bargains.")). Instead, the parties chose not to include such language. "The absence of such express language in an agreement between two sophisticated entities . . . strongly suggests that the parties had not agreed to the coverage of" those risks. *See id.*

Turning to the policy's covered risks, the failed subdivision plan does not invoke either the "right-of-access" or "unmarketability" provisions. First, as delineated in Mr. Nielsen's uncontroverted expert report, "the proposed plan for new roads *inside* the Property and how those roads would connect to existing roads is not part of the analysis of the right of access to the Property

---

insurance."). As such, it "may exercise more bargaining power vis-a-vis the insurers, and therefore be in less need of protection from the courts than other insureds." *See id.* at 905. And, while under Pennsylvania law, the "reasonable expectations" doctrine applies "regardless of whether the insured is sophisticated," Community Bank's level of sophistication is nonetheless a factor in whether it may invoke said doctrine. *See id.* at 906 ("[C]ourts should carefully consider whether an insured of the specified level of sophistication had reason to know of the existence of the exclusion prior to purchasing or renewing the policy, and hence had effective control over the insurance transaction."); *see also Canal Ins. Co. v. Underwriters at Lloyd's of London*, 435 F.3d 431, 440 (3d Cir. 2006) (holding that, under Pennsylvania law, the reasonable expectations of an insured may overcome unambiguous policy language only when the insured is a noncommercial entity); *Downey v. First Indem. Ins.*, 214 F. Supp. 3d 414, 424 (E.D. Pa. 2016) ("The Third Circuit has also observed that status as a 'sophisticated purchaser' of insurance is a 'factor to be considered when resolving whether the insured acted reasonably in expecting a given claim to be covered.'") (citation omitted).

as a large unplatted parcel. The only question in the access analysis is whether or not the Property had access onto at least one existing road." (*See* Docket No. 37-4 at 30 (emphasis in original)). There is ample evidence in the record that the property enjoyed a right of access from at least one road. In Mr. Nielsen's expert report, he notes that the subdivision plan depicted the property as "abutting Gillcrest Drive on the south, Wood Street on the northwest, Antler Drive and Dale Street on the northeast and Arnoni Drive to the east." (*Id.* at 137). Beyond the expert report, Community Bank's own 2008 appraisal report states that the property "appears to be accessible from Antler Drive and Arnoni Drive." (Docket No. 37 at ¶ 74; Docket No. 40 at ¶ 74). And Community Bank's Chief Credit Officer, Ralph Burchianti, testified in his deposition that Community Bank had access to the property from two points – "either through Dale Street or Arnoni [Drive]." (Docket No. 37-5 at 39). Aside from road access, Community Bank attempts to argue that because the entire parcel has a single tax parcel identification number, the property lacks access. (Docket No. 42 at 8-10). However, Fidelity's expert, Mr. Nielsen, stated that "[i]n his considerable research on the subject . . . [he found] no research treatise, article, court decision or other authority suggesting that ownership of real estate is rendered questionable by the fact that the taxing authority elects to combine two or more legal parcels for taxing purposes" and that "[t]he taxing of real estate has nothing to do with its title." (Docket No. 37-4 at 41-42). Beyond its initial claim in the complaint, Community Bank has neither filed a rebuttal expert report nor argued in its brief that the property lacked a right of access. Accordingly, because the entire parcel could be accessed from public roadways and the parcel's tax identification number is irrelevant to title or access to the property, Community Bank enjoyed "the right of reasonable ingress and egress" to and from the property, and the policy provisions covering right of access and unmarketability of title were not invoked.

Similarly, the property was not rendered unmarketable by the failed subdivision plan. Assuming the Blackwood Acres Plan No. 1 was incorporated by reference into the policy, Community Bank's title was not affected when it fell through. Community Bank claims that, "[a]t the very least . . . the Policy is ambiguous as to whether . . . the Property's title was unmark[et]able because it was not as set forth in Blackwood Acres Plan No. 1." *See* (Docket No. 42 at 6). Under the plain terms of the policy, "unmarketability of the title" is specifically defined as "an alleged or apparent matter affecting the title to the land . . . which would entitle a purchaser of the estate or interest . . . to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title." (Docket No. 1-4 at 12 ¶ 1(g)). Here, it is clear that the failure of the subdivision did not "*affect*[] the title to the land" because neither it nor the subsequent foreclosure sale had any effect on Community Bank's interest in or title to the property. (*See id.* (emphasis added)).

Despite same, Community Bank maintains that its title was affected because the failed subdivision plan caused the property to lose value, which in turn, made its title unmarketable. A discarded subdivision plan, even though it may cause property to lose value, however, is not a matter affecting title to property. *See Whaley v. First Am. Title Co. of Mid-West*, 2004 WL 316978, at *3-4 (Ct. App. Tenn. Feb. 19, 2004) (holding that "[an] improper subdivision of Plaintiffs' property d[id] not render the title unmarketable" and noting "the distinction between economic lack of marketability and unmarketability of title"). Rather, the frustrated subdivision plan constitutes "a defect in the physical condition of the property that makes the property [more] economically difficult to sell." *See id.* And the resulting loss in resale value of the property did not render the title unmarketable. *See, e.g.*, *id.* ("[A] difference exists between economic lack of marketability, which relates to physical conditions affecting the use of the property, and title

marketability, which relates to defects affecting legally recognized rights and incidents of ownership.") (citations omitted)); *see also Denny's Restaurants, Inc. v. Sec. Union Title Ins. Co.*, 859 P.2d 619, 629 (Wash. App. 1993) ("[A]lthough resale value is almost always detrimentally affected by unmarketability, it does not necessarily follow that when the resale value of property drops because of the physical condition of the land, the land is unmarketable. In other words, a distinction exists between marketability and merchantability.") (citations omitted)); *Hocking v. Title Ins. & Trust Co.*, 234 P.2d 625, 629 (Cal. 1951) ("One can hold perfect title to land that is valueless; one can have marketable title to land while the land itself is unmarketable."). Further, the diminution of value that Community Bank seeks is not a "suffered loss or damage by reason of matters insured against by th[e] policy." (*See generally* Docket No. 1-4 at 2; *see also id.* at 13, ¶ 7). Thus, Fidelity is not liable for the diminution of value as a result of the failed Blackwood Acres Plan No. 1.

Because "[i]t is the role of the courts to enforce the agreement made by the parties—not to add, excise or distort the meaning of the terms they chose to include," *see In re Energy Future Holdings Corp.*, 842 F.3d 247, 254 (3d Cir. 2016), the Court is not free to expand the policy's coverage beyond what the parties intended. Therefore, with the Court having found that the asserted provisions were not triggered, the Court further finds that Community Bank is not entitled to the either the declaratory or damages relief it seeks.

## VI. CONCLUSION

Based on the foregoing, no genuine issue as to any material fact exists and Fidelity is entitled to judgment as a matter of law. Accordingly, Fidelity's Motion for Summary Judgment [37] is hereby GRANTED. An appropriate order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer, Senior U.S. District Judge

22

Date:   July 23, 2021

cc/ecf:  All counsel of record.